GSKP LLC v Balcon (2024 NY Slip Op 50110(U))

[*1]

GSKP LLC v Balcon

2024 NY Slip Op 50110(U)

Decided on February 2, 2024

Civil Court Of The City Of New York, New York County

Ortiz, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 2, 2024
Civil Court of the City of New York, New York County

GSKP LLC, Petitioner, Landlord,

against
Gayle Balcon, Respondent, Tenant, ROBERT D. GORMAN, 
 "JOHN DOE" and/or "JANE DOE" Respondent, Undertenants.

Index No. L&T 53598/16 - NY

Petitioner was represented by Jeffrey Seiden and Evan Nahins, Esq. of Borah Goldstein et. al at 377 Broadway, 7th floor; New York, NY 10013; (212) 431 — 1300, ext. 307; jseiden@borahgoldstein.com and Respondent was represented by Thomas Hillgardner, Esq. 82-63 170th Street, Jamaica, NY 11432, (718) 657 — 0606; tomhillgardner@gmail.com

Frances A. Ortiz, J.

This is a holdover proceeding brought by GSKP LLC, the landlord ("Petitioner") against, Gayle Balcon, the tenant ("Respondent") seeking to recover possession of 28 Bond Street, 2nd floor front a/k/a 2-F, New York, NY 10012 ("the subject premises"). According to the petition, the subject premises is not rent stabilized or rent controlled. However, it is rent regulated pursuant to the Multiple Dwelling Law Article 7C. The petition further indicates that the Petitioner is in compliance with the legalization requirements of the Multiple Dwelling Law Article 7 C and Loft Board regulations. 
Pursuant to paragraph thirteen (13) of the petition the subject premises is not being used by the Respondent as her primary residence and Petitioner is entitled to possession of the premises. Additionally, the Notice of Termination dated December 23, 2015 [FN1]
indicates Respondent's tenancy is being terminated under Article 7-C of the Multiple Dwelling Law, 29 RCNY2-08 (j) (1) because the subject unit is not the primary residence of the resident occupant; that Respondent has not maintained an ongoing substantial physical nexus to the premises for actual living; that Respondent failed to spend more than 183 days out of the preceding year residing at the premises which is confirmed and substantiated by the Petitioner, since [*2]Respondent is using an address in Floyd, Virginia as a home address including a phone number of (540) 745 — 2386; that Respondent is the owner of a house in Floyd, Virginia; that Respondent's car has Virginia license plates; that Respondent is not registered to vote in New York; and that Respondent does not have a New York State driver's license.
Respondent appeared by counsel who asserted defenses, affirmative defenses and a counterclaim in an amended written answer. (NYSCEF Doc. 160). Specifically, the answer alleges denial of certain paragraphs of the petition, that Respondent is a protected occupant under the Loft Board, that the original Petitioner's [FN2]
-"Saada Mehmet Roberts" — mother transferred the building ownership to "28 Bond Street Associates, Inc." in July 10, 2000; that there is no residential certificate of occupancy on file with the Department of Buildings; that upon information and belief, the Petitioner is not in compliance with Article 7-B standards of the Multiple Dwelling Law; that as a result Petitioner is not entitled to the collection of use and occupancy; and a counterclaim for attorney's fees based upon a three year lease provided to Respondent in April 1978. (Petitioner's 3 in evidence).
A trial on the matter was conducted on January 20 and 23, 2023, February 2 and 7, 2023, March 3, 16 and 17, 2023, May 12, 2023, July 7, 2023 and August 4, 2023. The following witnesses testified on behalf of the Petitioner: Saada Roberts and Gayle Balcon. The following witnesses testified on behalf of the Respondent: Gayle Balcon and Stephen Weber. Petitioner entered into evidence thirty-five (35) exhibits and Respondent entered into evidence fourteen (14) exhibits.
 TESTIMONY
Saada Roberts testified that that she is the managing member of the Petitioner's LLC since 2019; that she manages the subject building by repairing and cleaning it; that she visits the subject building regularly; that in the time period of 2014 and 2015 she visited the building three times a week to maintain the garbage disposal of the building; that she needs to obtain a certificate of occupancy for the building; that she hired an architect to help get the legalization process and narrative statement needed for the Loft Board to obtain the subject building's interim multiple dwelling status; that as a result she visited the building at least four times a week and even twice a day; that she lived at 26 Bond St. which is the building next door, up to 2012; that she knows the Respondent since 1990; that Respondent was not living at the subject premises prior to 2014; that prior to 2010 Respondent had a pattern of not being at the building; that in 2010 there was a change in pattern from Respondent; that Respondent would drive her blue bus Volkswagen and go away weeks at a time; that around 2010 she saw that Respondent and her husband would leave from Christmas till June starting in 2010; that they would not come back until September; that after 2010 there was a time when Respondent asked her to sublet in September of 2010; that she objected to the sublet but that her objection was too late so she had no choice but to allow the sublet; that someone by the name of James Knight lived at the subject premises from January 13, 2011 till January 13, 2013; that in 2013 Respondent came back in April 2013; that she mailed keys for the subject premises to Respondent in Virginia; that Respondent arrived in May or June of 2013 with spotty occupancy; that Respondent returned in mid-July and sometime between July and September 2013 but it was spotty; that then [*3]Respondent returned sometime in mid-October to November 2013, that in 2014 she saw Respondent walking her dog and heard her birds chirping; that she knew when Respondent was not present at the subject premises because it would be silent (e.g. no dog or bird noises); that in 2014 Respondent came in May and June 2014 with very spotty stays -not the whole time - or for one week and nothing more-; that she came back in September 2014 and then left in October 2014; that before the end of that month she tried to get inside the apartment to do some repairs and Respondent was not in New York; that Respondent may have come back late in November of 2014; that at the time the utility was turned off; that she had a conversation with Respondent and her husband in July 2014 about an inspection that was needed; that they spoke to her about the home in Virginia; that Respondent told her that the home in Virginia was her husband's-Bob's- home; that he inherited it; that there was a rotation of people coming into the building who got Respondent's mail from 6:00 to 7:00 p.m. and watered Respondent's plants; that Respondent mailed-in her rent checks; that Respondent turned off the utility in mid March 2014; that in 2014 she called Respondent's phone landline at the subject premises and the message indicated the line was out of service; that when she needed access to the subject premises she obtained it from another tenant in the building - Brent Buell; that there was a second key to the bottom lock; that Respondent would say to her that her sister and her friends are visiting but the Respondent was not there; that she spoke to the Respondent in July 2014 and October 2014 because there was something wrong with the drains in the subject premises; that in 2010 she realized that something had changed in Respondent's living situation - there was a new vehicle with a non- NY license plate; that on August 30, 2010 she found an online post by the Respondent seeking to purchase a Waterman stove for her farmhouse; that she never saw the Respondent from October 2014 to July 2015; that she saw Respondent for first time on July 21, 2015 on her video surveillance camera; that Respondent came into the building and brought stuff in during the night; that there were two to three people with her; that she reached out to Respondent in April 2015 because she needed access to the premises and the electricity was off when she went inside; that Brent Buell let her in; that Respondent did not respond to her access request; that she made request for access via registered and certified mail and taped letters to the door; that after July 21, 2015 to September 2015 she would see Respondent on Tuesdays, Wednesdays and Thursdays; that she had video surveillance in front of the building and every floor landing in 2014 and that by 2015 she had full access to see the surveillance remotely; that in 2014 she had access to watch from her computer but in 2015 she could view from her phone and get a ping sound alert; that Respondent had people coming in and out in August 2015; that Petitioner's 28 in evidence is an e-mail from her dated August 25, 2015 to Respondent seeking access; that after the end of September 2015 or early October 2015 she saw Respondent pack her car and then returned around November 10, 2015; that Respondent sent her a written request to sublet the subject premises (Petitioner's 24 in evidence) - this was Respondent's second sublet request; that she saw the Respondent at the subject premises from November 2015 to December 2015; that Respondent did not follow up with the sublet request, after her attorney wrote a letter to Respondent declining the request; that she became aware of utility shut off at the subject premises in April 2015; that there was no electricity at the time and the lights were shut off; that she wrote to the Respondent saying when utility is shut off it's a safety issue for smoke detector; that Petitioners 29 in evidence is an e-mail from her dated April 3, 2015 regarding the electricity shut off; that there was a boiler issue at the premises and that's how she learned about the lack of electricity at the subject premises; that in early March 2015 and April 2015 she had a [*4]conversation with Respondent regarding the electricity; that she received the rent payments for 2015 through the mail; that the postage was from New York for two years except for two payments; that Petitioners 30 in evidence was April 2014 rent payments and envelope with the original postmark of Palm Beach, Florida; that she served a notice of termination on the Respondent because she said she waited too much time and needed the Certificate of Occupancy ("C of O") to be issued; that she needed a narrative statement inspection by the architects for the C of O in September 2015; that Respondent did not provide access, instead -the neighbor - Mr. Buel provided request for the boiler at the subject premises.
On cross examination Ms. Roberts testified that her mother owned the subject building in 1990; that Respondent in 2015 attended a Renaissance Fair and made jewelry; that the sanitation schedule from December 2013 was three times a week - Monday, Wednesday, and Friday-; that she habitually picked up the garbage; that during 2013 to 2015 she lived in various places near East 14th St. which was a 10 minute walk from the building; that she had video surveillance for the building; that if someone enters the building in front of the camera, the camera sensor will alert her; that up to 2010 she had an old system but she upgraded the system sometime in 2013; that she would view on the camera system from her phone in 2014 and 2015; that she was able to view the video surveillance from December 23, 2013 until December 23, 2015; that she did not save the images on the camera unless it was some kind of criminal activity - like a bike stolen or robbery or drug activity -; that there are no videos existing for the period 2013 through 2015; that the reason she did not save the images from the video is because the images were too large to store in the memory; that she does not keep a diary but takes notes sometimes which she puts on her phone; that the current status of the C of O for the building is that they're amending plans but that there's an issue with Respondent's unit affecting the C of O by the Loft Board; and that she constantly saw people coming and going to the subject premises from 2013 to 2015 who she did not recognize.
On re-direct Ms. Roberts testified that she visited the building daily between December 2013 and December 2015; that she never hired an outside vendor to sweep or mop the floors because she could not afford it; that she would visit the subject building to meet with the architect regarding the loft conversion; that she would see Respondent sometimes walking her dog on the camera; that if Respondent had her pets, she could hear the Respondent's birds or her talking or playing her podcast; that if there was silence at the subject premises it meant Respondent was not home; that the windows at the subject premises are visible from the outside so she could see if Respondent was at home with the lights on; that she would measure whether Respondent was home by the garbage output; that there's only three tenants in the building so she would know who was staying in the building; that there are currently issues with the C of O at the Loft Board attributed to Respondent's denial of access from the beginning of 2013; that the Respondent would tell her that she would not be available for access; that Respondent had a structure in the subject premises' mezzanine which affected her Loft Board application; that she had to change the plans with the architect because of the problem structures of the Respondent's boiler placement in the bedroom of the subject premises; and that she had to comply with the buildings code per her plumber.
Petitioner called Gayle Balcon to authenticate exhibits Petitioner sought to introduce into evidence which were produced in discovery. For instance, Petitioner's 4 in evidence was the deed for a home located at 481 Stonewall Road, NE, Floyd, Virginia ("the Virginia house") where Respondent was the grantor of the property and the grantees of the house are Respondent [*5]— Gayle Balcon — and her husband — Robert C. Dilger. Petitioner's 5 in evidence was the deed for the Virginia house dated April 6, 2010 showing Respondent purchased the house in April 2010 from Kerry L. Wood and Elizabeth M. Legg. Petitioner's 6 in evidence is the 2015 Real Estate Tax 1st Installment bill for the Virginia house listing Respondent and her husband as owners. Petitioner's 7 in evidence is the 2015 Personal Property Tax for Floyd County, Virginia listing Respondent and her husband as paid tax payers for Chevrolet motor home, Toyota Prius, Chevrolet truck, and Ford Lgt Convtnl. Petitioner's 8 in evidence is the 2014 Personal Property Tax for Floyd County, Virginia listing Respondent and her husband as paid tax payers for Chevrolet motor home, Toyota Prius, Chevrolet truck, and Ford Lgt Convtnl. Petitioner's 13 in evidence is Floyd, Virginia motor vehicle registration for Respondent expiring May 31, 2017. Petitioner's 14 in evidence is USAA automobile insurance policy for January 8, 2016 to July 8, 2016 for Respondent at the Virginia house address but Respondent also had the same policy for the period 2013 to 2015. Petitioner's 18 in evidence is Respondent's internet and phone service from Citizen's Technology at the Virginia house from April 2015 to January 2016. Respondent admitted she had phone service from 2013 - 2015 with Citizen's but did not provide it in discovery. She testified that her husband was there during that time period, that she was at the Renaissance Fair during the months of August and September in Tuxedo, New York and that she was in Deerfield and Gainesville, Florida for Renaissance Fairs; that her husband died on May 5, 2015 but she continued the service with Citizen's; that if service was on, it was because she had a friend from Floyd, Virginia who would pay the bill to use the internet service; that she would pay the service in cash or by credit card; that the Citizen's bill would have a "vacation concession discount" (see Page 318 of Respondent's 18 in evidence — showing $22.18 credit for January 1 — 31, 2016), after notifying them; that she would call Citizen's to place the account on vacation concession in January, February, March, August, September and October; and that she had no internet service at the subject premises from December 2013 to December 2015. Petitioner's 19 in evidence is Respondent's Appalachian Power utility bills for the Virginia house for the period September 2015 — December 2015. When Respondent was asked why she did not provide the Appalachian Power bills for December 2013 through August 2015, she replied she did not have it available and was unable to produce it, despite calling the company and the Petitioner's counsel was just going to have to take her "word for it." The bill statements show watt usage at the Virginia house with the most usage in November and December 2014 and usage in January and February 2015. Petitioner's 20 in evidence are Carter Bank & Trust statements under Respondent's name and her husband with the Virginia house address from January 2014 through January 2016. Petitioner's 26 in evidence is the 2014 and 2015 real estate tax assessment bills from Floyd County, Treasurer for the Virginia house addressed to Respondent and her husband as owners.
Respondent called as its first witness Gayle Balcon. Ms. Balcon testified that she was born in Toronto, Canada, that she moved into the subject premises in 1978; that she put a kitchen, bathroom and a heating system at the subject premises; that in 1985 she met her husband Robert Dilger; that he lived at the subject premises with her beginning in 1986 and before that he lived in Queens; that they dated for eight months and moved in quickly to the subject premises but they didn't marry right away because she wanted her green card plus he was married to someone else before; that Petitioners 9 in evidence is her marriage certificate; that she became a U.S. citizen in 2014; that Respondents D in evidence is her United States, Certificate of Naturalization; that she was a resident artist; that she was working and having a living space at [*6]the subject premises; that she was painting and making jewelry and sold it on Sixth Ave.; that she began her jewelry business in 1980; that her father had been a jeweler; that she has always been involved in jewelry; that from December 2013 to December 2015 she made the jewelry in the loft and on the bus; that she parked the bus in Virginia and at the Renaissance festival; that she sold jewelry in January, February, March, and April of 2014 and to 2015; that December 31st 1950 is her birthday; that on December 23, 2013 she was at the subject premises until December 30, 2013; that she went to Virginia to celebrate her New Year's Eve birthday party which was her practice; that her first show began January 24, 2014 until February 5, 2014; that this show was in Gainesville, Florida; that after February 5, 2014 she packed up her bus; that in mid-October she drove to Virginia; that her car and bus stayed in Virginia from late October to January 10, 2015 until she went to Florida for the Renaissance Fair there; that she would follow the bus in her Prius to Florida; that Bob would drive to Florida in the school bus; that this drive took two to three days; that her New York State driver's license (Respondents F in evidence) would expire December 31, 2022; that she sells her art at the Renaissance festival and other shows where the customers come to her; that she does shows in Gainesville and Deerfield, Florida, Floyd, Virginia; and she's been doing the Deerfield Beach and Gainseville, Florida shows for 15 years and the Floyd, Virginia show for 20 years; that she has a school bus which she has developed into a living situation; that the bus has a bed, kitchen and a living space; that she parks the bus on the campus grounds during the fairs; that the bus is a 1956 Chevy bus; that the Renaissance fair is a village put together with booths, retail crafting, rides, bow and arrow games, food court, beer halls; that she wears Renaissance clothing; that she talks in an old English language accent; that there are trees and fairies dresses worn; that the patrons dress like the Renaissance people; that Respondents I in evidence is a picture from 2014 taken at the Renaissance Fair in Deerfield, Florida; that Respondent's J in evidence is a picture taken in 2014 of a Pavilion show in Deerfield, Florida; that the setup for the fair takes two to three days and it's a difficult way to set the tent in a 1 1/2 days; that in February 10, 2014 through March 18, 2014 there was a parade (shown in Respondent's I in evidence) that took place from February 10, 2014 to March 17 2014; Respondent's K in evidence is a photo taken in 2015 of the pavilion at Tuxedo, New York's Renaissance Fair; that the pavilion was built in 1998; that Respondent's L in evidence is a photo taken in August or September of 2015 of her booth; that she got to Virginia in December 2013 by driving her Prius that she owned since 2010; that she always spent Christmas with her in-laws; that Floyd, Virginia is 500 miles away from the subject premises and about a nine to eleven hour drive; that on December 31, 2013 she had her birthday party in Virginia; that she would clean the bus and take cases full of jewelry on the bus to Virginia; that she and her husband had a 100 gallon water tank for their toilet on the bus, for washing dishes and for their birds and dogs; that there was no shower in the bus; that there was a sink, a whole kitchen, refrigerator and three stove burners and an oven on the bus; that in January 2014 she departed Floyd, Virginia; that around January 15, 2014 she left for Gainesville, Florida which took about three days and 1000 miles; that she had a problem with the bus on the way to Florida; that she had to stop in Georgia but drove the Prius and followed the bus; that she arrived in Gainesville Florida on January 21 or 22, 2014; that she would go to the office of the festival and get her booth information; that she would set up her tent and make sure it was in the right space; that she brought the tent pavilion with her and the poles; that the Florida festival began on January 24, 2014 and had to set up the shop; that it takes two days; that she would set the tables and clean the jewelry - this was a tradition at the Renaissance fair-; that the festival ended [*7]February 5, 2014; that then she packed and headed to Deerfield, Florida; that this trip is a one day trip with a six hour drive; that she arrived in Deerfield, Florida around February 7, 2014; that she made money from the fairs; that the Gainesville, Florida show is shorter than the Deerfield, Florida show; that the Deerfield, Florida fair is much longer; that on February 7, 2014 she went to the office from her camping site; that the vendor booth is a 10 minute walk to the office; that she collected sales tax; the salesperson from the fair would come and collect the sales tax for Deerfield Beach; that she did not apply for a sales tax license in Florida because Florida does not require it; that she does not have a house in Florida; that shows are only on the weekends and that she's busy making her jewelry in the meantime; that typically she makes her jewelry at the subject premises; that her equipment includes a flex shaft drill motor and cord buffing machine; that she needs a small space for her workshop; that she needs pliers, a good lamp and scissors; that she uses a steam cleaner for the jewelry; that she left Deerfield Beach on March 21 or March 24, 2014; that when they left they stopped in Tampa to see a mechanic because there was a problem with the bus; that they had to go to Alabama to get a part for the bus; that the bus was parked on the property; that they went to a junkyard in Alabama to get the bus part; that they drove to Alabama which was like a six to seven hour drive; that they departed Tampa on April 4, 2014 for Virginia; that it took two days; that she was with her husband; that she took a break and did some planting in Virginia and mowed the lawn; that she painted the roof and made sure the house was in good shape; that she took the jewelry out of the bus to clean it; that there's a Tumbler to place jewelry in it because another show was coming and she was getting stuff together; that she was setting up the bird area in the Virginia house - the cage for the birds and she had another cage in the house; that she has four large parrots; that she carried her seedlings from Deerfield, Florida; that she had 40 containers with seedlings that included beets, onions, tomatoes, cucumbers, cilantro, parsley and potatoes; that she stayed in Virginia three weeks and planted the garden; that she departed on May 1, 2014 and her husband stayed in Virginia; that she drove to New York City with her friend -Steve - and the birds; that on May 2, 2014 she arrived in New York City; that she went home and set the birds' home; that she cleaned the place up and started making jewelry; that she parked her Prius by the subject premises; that she went back to Virginia in May via the mega bus to D.C. then to Virginia; that then Steve drove the Prius back to Virginia no May 11, 2014; that the week of May 18, 2014 to May 24, 2014 while in Virginia she planted and met friends; that she cleaned jewelry but the birds stayed in New York City; that someone bird sat for her; that she came back to the subject premises on May 25, 2014; that from June 2014 to the last week of July 2014 she went to the Floyd, Virginia show; that she bought her materials from Michael Toback on West 42nd St.; that she shops at jewelers there and at AGC on West 32nd St.; that from July 23rd to July 31, 2014 she was at the Floyd fest, that on August 1, 2014 she left Floyd, Virginia to work in Tuxedo, New York; that on August 6, 2014 she drove to the pavilion and set it up; that for eight weekends she worked the Renaissance Fair in Tuxedo, New York from August to September; that October 17, 2014 she was at the Virginia house planting her garlic until the end of October 2014; that she went to the Floyd, Virginia home in October 2014 to grow her food, get hay, crushes leaves, mulch her garden, dehydrate her vegetables and fruits such as: beets, kale, blueberries, asparagus, broccoli, cauliflower and then she brings the food to New York; that she departed Floyd, Virginia on November 5, 2014 and came back to the subject premises to stay for the rest of the year; that she never used the Carter Bank account; that when her husband passed away she had the Social Security benefits in her name at the Floyd, Virginia address; that she gets widow survivor's [*8]benefits from Social Security; that she began her naturalization certificate process in early 2013 because she did not care to become an American citizen; that the first week of November 2014 she went to the subject premises; that when she arrived at the subject premises on November 3, 2014 she shopped and visited friends she had not seen; that in November 2014 her husband Bob stayed one week at the subject premises; that he drove the Prius back to Virginia; that she was without a car; that she stayed at the subject premises until December 30, 2014; that then she left to Virginia; that her husband's sister lives in Queens and she spends Christmas with them; that she was at the subject premises every day from November 4, 2014 until December 30, 2014; that on January 15, 2015 she left Floyd, Virginia for Gainesville, Florida; that it took three days to drive to there but she had a flat tire so the tire company came to put the tire on; that the show in Gainesville, Florida ended February 5, 2015; that they left Gainesville, Florida and packed for the Deerfield Beach, Florida fair which lasted from February 11, 2015 until March 20, 2015; that the show is a five week long show from Saturday and Sunday; that from March 8 to March 15, 2015 her husband was in the hospital in Boca Raton, Florida, that she departed from the Deerfield Beach area on March 20, 2015; that the destination was Floyd, Virginia but that they did not arrive there because the bus had to be towed and her husband went into the hospital until May 3, 2015 in Fort Pierce, Florida where he was in intensive care in the hospital; that her husband passed away on May 5, 2015; that he was hospitalized in Fort Pierce and then transferred to Gainesville, Florida where he died; that he was in the hospital from March 23, 2015 to May 5, 2015; that after her husband passed away she was in bad shape and her brother came to her; that her husband was cremated; that she carries his ashes with her on her necklace; that she stayed in Gainesville, Florida from May 5, 2015 until May 15, 2015; that she was in a hotel; that her brother paid for her so she would not have to sleep on the bus; that she left Gainesville, Florida on May 15, 2015; that she unpacked the bus and her sister-in-law drove the Prius to Virginia; that our friend Larry Smith and Steve Pigford drove the bus; that she arrived in Floyd, Virginia on May 15, 2015; that the bus arrived in Virginia on or about May 30th or June 1, 2015; that she had a memorial for Bob on June 15, 2015; that she planted her garlic in June of 2015; that after the memorial service was done in Floyd, Virginia, she stayed there until June 15 2015; that there were at least 50 persons at the memorial; that they knew her and Bob and came from all over to the memorial; that she departed Virginia on July 21, 2015; that she cancelled the Floyd festival; that she prepared for the Renaissance Festival in Tuxedo, New York and packed her Prius, the birds and dogs; that her casita trailer arrived in Tuxedo, New York sometime in July but the trailer had all her crystal supplies; that her trailer is made of fiberglass and has a kitchen and a bathroom; that someone can live in the trailer; that the Renaissance Fair in Tuxedo, New York in 2015 lasted 8 weekends from August 1, 2015 to September 28, 2015; that at the end of the first weekend of August 1, 2015 she went to the subject premises and spend three to four days, from Mondays through Fridays; that every Friday she left to go to Tuxedo, New York; that she went back to the subject premises either September 21 or September 28, 2015; that she was at the subject premises about September 21, 2015 to October 16, 2015; that on October 16, 2015 she left for Tuxedo, NY to get her Casita and then drove overnight to Floyd, Virginia where she would plant her garden; that she planted her garlic on October 18, 2015 and cleaned "her house" including the barn, stable and tractor, that Bob wanted to be a farmer and wanted to spend all his time in the country property; that she stayed in the Floyd, Virginia house until November 9, 2015 and then she drove the Prius back to New York City.
On cross examination Respondent [FN3]
 testify that her schedule is static; that she worked three Renaissance festivals - the Gainesville fair from 2005 to 2015 every year, the Deerfield Beach fair from 2005 to 2015, every year; that she stopped going to the Deerfield and Gainesville fair after 2015; that she worked the Renaissance Fair in Tuxedo, NY in 2019; that while working the fairs in Florida she stayed and lived on her bus; that when she worked the Floyd, Virginia festival she would stay on the campgrounds; that she did sublet the subject premises in 2011 and 2012; that her address on the notice of intent to sublet was listed as 1818 Fallentimber, New Castle 40050, Kentucky (Respondent's B in evidence) but that she did not reside there; that she purchased the Virginia house in April of 2010; that "she needs to have her studio" to make her jewelry; that she makes jewelry while in Florida; that it is not necessary for her to be at the subject premises to make for jewelry only, while she is at the Tuxedo, New York Renaissance Fair; that it was important for her to be at the subject premises to make that jewelry; that during February 1, 2011 through January 31, 2013 she sublet the subject premises and therefore she did not stay at the subject premises; that on December 1, 2010 she spoke to James Knight about subletting the subject premises to him; that Petitioners 19 in evidence the Appalachian Power bill shows service of utility usage at the Virginia home from December 2013 to December 2015; that Petitioner's 22 in evidence - the Con Edison bills from October 2014 to December 2014 show no usage of electricity at the subject premises from January through April 2014; that it shows usage from January 2015 to June 2015; that Con Edison service was disconnected for that time period of approximately ten months; that she never discontinued utility service at the Virginia house because her husband and others were there; that there was more usage in September 2015 at the Virginia home than at the subject premises; that she sublet at the Kentucky address in 2011 through 2013; that when she made her sublet request she never put Petitioner on notice that she was traveling for her work and her jewelry because she indicated that she had no obligation to tell Petitioner of her life plans; that she wanted to travel during the sublet; that she sublet the subject premises for February 1, 2011 through January 31, 2013; that she did not have access to the subject premises for 10 months during the relevant time so she did not make jewelry at the subject premises; that the Virginia house was her husband's primary residence; that Petitioner's 24 in evidence is a sublet request dated November 20, 2015 where she wanted to sublet the premises to Robert Gorman so she could travel out of the country; that she does not always celebrate her birthday in Virginia which she consistently testified that she did celebrate her birthday in Virginia; that she had her birthday at the Virginia house on December 31, 2013; that the Petitioner's 24 in evidence - the 2015 sublet request - indicated the subject premises had her mailing address but the sublet request of 2013 had a Kentucky address; that she never from December 2013 till December 2015 sublet the Virginia house; that after her husband Bob died, she never sublet the Virginia house which was her "vacation house"; that during her deposition she stated she only spent four months at the subject premises, however, now she says that she spend five months at the subject premises in 2014; that in 2015 she spent less than five months at the subject premises; that she listed on her husband's death certificate (Petitioner's 10 in evidence) the Virginia house as her address but denies giving that address to the State of Florida; that the reason she goes to the Virginia house is to work on [*9]her bus; that Petitioner's 25 in evidence - the gemstone factory sales receipt dated September 8, 2015 has the Virginia house as the shipping address but Respondent stated that this was an incorrect shipping address and that it was shipped to the Renaissance Fair; that the Petitioner's 21 in evidence Wells Fargo/Crown Classic Banking credit card statements for the period July 29, 2014 through September 26, 2014 show a charge on August 18, 2014 in Roanoke, Virginia at T.R. Stop Mart but according to her testimony on August 18, 2014 she would have been in Tuxedo NY; that the same credit card statement shows a transaction on September 8, 2014 in Mahwah, New Jersey but Respondent then testified that she was in New York at that time and that on September 9, 2014 the statement shows a transaction in Winchester, Virginia but she testified that she was at the subject premises at that time; that the credit card statement shows a transaction in Floyd, Virginia on September 12, 2014 for Oddfella's Cantina and another transaction on September 15, 2014 in Lexington, Virginia at Shell Oil; she then stated that every year is different, although she previously testified that every year her travel pattern was the same; then she said that she had given her husband the credit card which was incredible; then the court took notice of Petitioner's 27-b in evidence -the Respondent's deposition transcript page 128-131 beginning on line 4 — where Respondent indicated no one else had access to her debit card for that account, then she stated that she gave a credit card to her friend, when he picked up her motor home because she was paying for all the expenses in May and June 2014; that Petitioner's 20 in evidence — the Carter Bank & Trust statements from Floyd, Virginia with her name and her husband's show a deposit dated September 11, 2014 with Respondent's name as the depositor, although Respondent testified that she was at the subject premises on September 11, 2014; Respondent denied making the September 11, 2014 deposit in Virginia; that Respondent denied using Paypal for her business but her husband may have, although on Petitioner's 20 in evidence, there is a Paypal transaction dated April 27, 2015 which was the time her husband was critically hospitalized in Florida; that Petitioner's 15 in evidence — USAA Federal Savings Bank letter dated July 14, 2015 changing the credit card account to her name and listing the address for the Virginia house as her address and also included a USAA Life Insurance Company explanation of benefits; that she had two magazines subscriptions (National Geographic and Garden Magazine) sent to the Virginia house; that Petitioner's 16 in evidence -included Virginia Farm Bureau Mutual Insurance Company — Farmowner's Policy — for the Virginia house for the period April 27, 2014 to April 27, 2015 and Form 1095-B from the Department of Treasury/Internal Revenue - Health Coverage tax form in Respondent's name with the address of the Virginia house and USAA letter dated July 9, 2015 addressed to Respondent at the Virginia house confirming her membership eligibility; that she still has USAA for her car insurance in Virginia; that Petitioner's 17 in evidence is Respondent's Medicare Summary listing her address as the Virginia house for claims processed December 25, 2015 through March 24, 2016; that Respondent admitted that she collects Social Security benefits with the Virginia address via direct deposit because it was her husband's address; and that she used local Virginia banks because she liked small banks that talk to their customers.
On re-direct, Respondent testified that she went "home" to Virginia in July 2015 to get her priorities in place; that she had to prepare for the New York Renaissance Fair; that she had to close up everything at the Virginia house and had never done so alone before Bob died; that she had no jewelry bench in Virginia; that she did not make jewelry on the bus in Virginia; that her husband had sometimes made jewelry on the bus; that she kept the Wells Fargo account open because "The Square" would deposit into that account and she had no desire to change the [*10]account; that she dropped the USAA health insurance in 2016 except she kept the automobile insurance in Virginia; and then she recanted her testimony regarding her December 31st birthday celebrations always in Virginia and stated that she alternated her birthdays in New York City and Virginia. 
On re-cross Respondent testified that she was in Virginia until late July 2015; that she made jewelry outside the grounds of the Renaissance Fair; that she did not want to make jewelry in Virginia because it was a place for gardening and other activities; and that from December 2013 through December 2015 the only personal bank account with her name was the Carter Bank.
On re-re-direct, Respondent testified that from December 2013 through December 2015 she had a Wells Fargo account which she used to pay Con Edison bills and Verizon; and that the Carter Bank account was not her account — it was a joint account with her husband.
Stanley Webber testified that he is a tax preparer for his company "S W Financial Services"; that he graduated from Baruch College with a bachelor's degree and an MBA from St. John's University in advanced business administration; that he has prepared Respondent's tax returns for twenty years; that he has a software which interfaces with Thomson Reuters; that Respondent's P in evidence is an uncertified copy of Respondent's 2014 and 2015 federal and New York State [FN4]
tax returns showing on the signature line of all those returns as completed by him and dated on July 11, 2016 [FN5]
; that Respondent's Q in evidence is a certified copy of Respondent's 2015 federal and New York State income tax returns dated as prepared on April 5, 2016; and that Respondent's R in evidence is a certified copy of Respondent's 2014 federal and New York State income tax returns dated as prepared on March 15, 2015. Mr. Weber could not really explain why the 2014 federal tax return - Respondent's P in evidence -provided in discovery read "Amended" on the top portion of the form. 

DISCUSSION
Based upon the admitted documentary evidence, credible testimony of Ms. Roberts, the contents of the court file, the Petitioner has proven the prima facie elements of the Petition. Specifically, Petitioner proved that it is the owner of the subject premises (Petitioner's 1 in evidence — certified deed); that Respondent's tenancy was properly terminated by a Notice of Termination dated December 23, 2015; that the subject premises is regulated pursuant to Multiple Dwelling Law Article 7C and registered as an interim multiple dwelling with the New York City Loft Board (Petitioner's 2 in evidence — certified Loft Board registration renewal application); that Respondent continues to holdover at the subject premises; and that Respondent is the lease holder of the subject premises (Petitioner's 3 in evidence — initial lease dated April 1978).
Petitioner commenced this summary holdover proceeding based upon a claim that Respondent is not utilizing the subject premises as her primary residence, that she has not maintained an ongoing substantial physical nexus to the premises for actual living, that Respondent failed to spend more than 183 days out of the preceding year residing at the subject premises which is confirmed and substantiated by Respondent's ownership and use of her house [*11]in Floyd, Virginia.
Here, the evidence and credible witness testimony presented by Petitioner at the trial demonstrated by a preponderance of the evidence that Respondent did not use the subject premises as her primary residence for the relevant time period of December 23, 2013 through December 23, 2015, as indicated in the Notice of Termination and Petition. Glenbriar Co. v. Lipsman, 5 NY3d 388 (2005); SJS Thompson, LLC v. Singer, 77 Misc 3d 136(A) (AT 1st Dep't 2023); 284 Parkway Assocs. v. Despinosse, 73 Misc 3d 135(A) (AT 2nd Dep't 2021).
Conversely, Respondent did not rebut Petitioner's evidence nor demonstrated a substantial physical nexus to the subject premises. Actually, Respondent did not prove her defenses and affirmative defenses raised in the answer which were that Respondent is a protected occupant under the Loft Board, that Petitioner is not the owner; that there is no residential certificate of occupancy on file with the Department of Buildings; that upon information and belief, the Petitioner is not in compliance with Article 7-B standards of the Multiple Dwelling Law; and that as a result Petitioner is not entitled to the collection of use and occupancy. These are not defenses to a non-primary residence holdover. The admitted documentary and testimonial evidence, indeed, demonstrated that Respondent has protected occupant status under the Loft Board, that Petitioner is in compliance with the interim multiple dwelling status of the subject building as required by the Loft Board, that there is no certificate of occupancy issued yet because Petitioner is still in the legalization process with the Loft Board and in fact Respondent has impeded the legalization process by her denial of access to Petitioner's architect and workers.
Respondent in her post-trial memorandum of law attempts to assert a defense never raised in her amended answer, namely, that her absences from the subject premises are excusable due to her itinerant work attending Renaissance fairs and other fairs where she sold her jewelry. If an affirmative defense is not raised in the answer, it will be considered waived. CPLR § 3018(b). The rational for this is that a party shall plead all matters which if not plead would be likely to take the adverse party by surprise. Respondent's failure to raise the itinerant work defense in her Verified Amended Answer amounts to a waiver of that affirmative defense and prejudicial to Petitioner due to the surprise claim. Lippo v. Cruz, 42 Misc 3d 1230(A) (Richmond Cty Sup. Ct. 2014).
Now, turning to Petitioner's claim of non-primary residence against the Respondent. Under Title 29 (Loft Board) of the Rules and Regulations of the City of New York, Chapter 2, Interim Multiple Dwellings, § 2-08.1 (a) (1), the landlord of an interim multiple dwelling registered with the Loft Board may bring eviction proceedings against the residential occupant of a unit in a court of competent jurisdiction on the grounds that the unit is not the primary residence of such residential occupant. New York City, NY, Rules, Tit. 29, § 2-08.1.
The Court of Appeals has upheld the authority of a landlord of a registered interim multiple dwelling with the Loft Board to bring eviction proceedings against a residential occupant, when there was no lease or rental agreement, and the unit was not the primary residence of such residential occupant. Lower Manhattan Loft Tenants v. New York City Loft Bd., 66 NY2d 298 (1985). Additionally, the Appellate Division, First Department has held that the Loft Law is in pari materia with the Rent Control Regulations and Rent Stabilization Law. As such, the remedy of eviction already available to landlords of rent controlled and rent stabilized apartments is available to landlords of units subject to the Loft Law. BLF Realty Holding Corp. v. Kasher, 299 AD2d 87 (1st Dep't 2002); D & R Realty Corp. v. Blakely, 9 Misc [*12]3d 203 (NY Cty, Civ. Ct. 2005).
Since the Loft Law is in pari materia with the Rent Stabilization Law, this Court will look to the definition of primary residence in RSC §2520.6 (u). This section provides that although no single factor shall be solely determinative of a primary residence in determining whether the subject premises is occupied as a primary residence, factors may be the place of residence on any tax return, motor vehicle registration, driver's license or other document filed with a public agency; use by an occupant of an address other than such housing accommodation as a voting address; occupancy of the subject premises for an aggregate of less than 183 days in the most recent calendar year, except for temporary periods of relocation pursuant to RSC §2523.5(b)(2)[FN6]
of the Rent Stabilization Law and subletting of the subject premises. 
According to RSC §2523.5(b)(3) which was formerly known as RSC §2523.5(b)(2), the minimum periods required for primary residency shall not be deemed to be interrupted by any period during which the "family member" temporarily relocates because he or she: engaged in active military duty; enrolled as a full-time student; not in residence due to court order; engaged in employment requiring temporary relocation from the subject premises; hospitalized for medical treatment; or has such other reasonable grounds that shall be determined by the DHCR upon application by such person.
Moreover, relevant case law has defined primary residence as an ongoing, substantial physical nexus with the subject premises for actual living purposes. Katz Park Ave. Corp. v. Jagger, 11 NY3d 314 (2008); 68-74 Thompson Realty, LLC v. McNally, 71 AD3d 411 (1st Dep't 2010);Emay Properties Corp. v. Norton, 136 Misc 2d 127 (AT 1st Dep't 1987).
Here, Respondent's testimony failed to establish that she maintained an ongoing, substantial physical nexus with the subject premises for actual living purposes for the period of December 23, 2013 to December 23, 2015. She admitted leaving the subject premises on December 30, 2013 for the Virginia house and did not return to the subject premises until the beginning of May 2014. She discontinued her utility service at the subject premises from about January 2014 to May 2014. (Petitioner's 22 in evidence — utility bills). However, she maintained the utility at the Virginia house. (Petitioner's 18 & 19 in evidence — Virginia utility bills). Then, she returned to the Virginia house the week of May 18, 2014, and she came back to the subject premises on May 25, 2014. Then, from June 2014 to the last week of July 2014 she went to the Floyd, Virginia fair. As such, just through July 2014, she spent less than 183 days at the subject premises. She returned to New York City in August 2014 through about October 15, 2014 to work the Tuxedo, New York, Renaissance Fair. While she was there, she only stayed at the subject premises during the weekdays. Then, in mid-October 2014 she returned to the Virginia house to plant her seedlings and address other activities. Her October 2014 stay in Virginia is evidenced by her Carter Bank transactions in Virginia. (Petitioner's 20 & 21 in evidence). Thereafter, Respondent did not return to the subject premises until July 21, 2015. This means that Respondent through her own admitted testimony did not reside at the subject premises for approximately 202 days in 2015, and this was only through July 21, 2015. During this time period, the utility service at the subject premises was disconnected from January 2015 through June 2015. (Petitioner's 22 in evidence). However, she continued the utility services at the [*13]Virginia house. (Petitioner's 18 & 19 in evidence). Respondent stayed at the subject premises from late July 2015 to October 15, 2015 on the weekdays only because she was in New York to work the Tuxedo, New York — Renaissance Fair. Once she finished the fair, she went back to the Virginia house in mid-October 2015 to do her planting and other activities. She returned to the subject premises on or about November 10, 2015.
Further, her testimony was inconsistent and incredible for a litany of reasons. She testified that she was in New York and never in Virginia from early August 2014 through mid- October 2014. However, Petitioner's 21 in evidence - Wells Fargo/Crown Classic Banking credit card statements for the period July 9, 2014 through September 26, 2014 show a charge on August 18, 2014 in Roanoke, Virginia at T.R. Stop Mart but according to her testimony in August 18, 2014 she would have been in Tuxedo, NY. The same credit card statement shows a transaction on September 8, 2014 in Mahwah, New Jersey but Respondent then testified that she was in New York at that time. Then, on September 9, 2014 the credit card statement shows a transaction in Winchester, Virginia but she testified that she was at the subject premises at that time. Also, the statement shows a transaction in Floyd, Virginia on September 12, 2014 for Oddfella's Cantina and another transaction on September 15, 2014 in Lexington, Virginia at Shell Oil. Then, she stated that every year is different, although she previously testified that every year her travel pattern was the same. Then, she attempted to explain her inconsistencies by saying she had given her husband the credit card which was incredible. This court took notice of Petitioner's 27-b in evidence -the Respondent's deposition transcript page 128-131 beginning on line 4 — where Respondent indicated that no one else had access to her debit card for that account. Then, she attempted to rehabilitate her inconsistencies stating that she had given a credit card to her friend, when he picked up her motor home because she was paying for all the expenses in May and June 2014. Further, Petitioner's 20 in evidence — the Carter Bank & Trust statements from Floyd, Virginia - with her name and her husband's show a deposit dated September 11, 2014 with Respondent's name as the depositor, although Respondent testified that she was at the subject premises on September 11, 2014. Then, Respondent denied making the September 11, 2014 deposit in Virginia. She denied using Paypal for her business, but her husband may have, although on Petitioner's 20 in evidence, there is a Paypal transaction dated April 27, 2015 which was the time her husband was critically hospitalized in Florida. 
Additionally, Respondent testified that she made her jewelry at the subject premises and not at the Virginia house. This was contradicted by Petitioner's 25 in evidence which is a Gemstone Factory receipt dated September 8, 2015 and shipped to the Virginia house. Also, Respondent was disingenuous to Ms. Roberts, when she told her that her husband had inherited the Virginia house. This was disputed by Petitioner's 5 in evidence which is the deed for the Virginia house dated April 6, 2010 showing that Respondent purchased the house in April 2010 from Kerry L. Wood and Elizabeth M. Legg.
Factors that may be considered in determining primary residence may be tax returns, motor vehicle registrations, driver's license or other documents filed with a public agency; use by an occupant of an address other than such housing accommodation as a voting address; occupancy of the subject premises for an aggregate of less than 183 days in the most recent calendar year, except for temporary periods of relocation pursuant to RSC §2523.5(b)(2) of the Rent Stabilization Law and subletting of the subject premises.
Here, Respondent's Q in evidence - the 2015 federal and New York State income tax returns- and Respondent's R in evidence - the 2014 federal and New York State income tax [*14]returns are extremely suspect to this court. As such, this court does not give much weight to those tax returns. The returns are contradicted by what was provided in discovery which is Respondent's P in evidence - an uncertified copy of Respondent's 2014 and 2015 federal and New York State - showing on the signature line of both returns as completed and dated on July 11, 2016 by Mr. Weber. However, Respondent's Q in evidence is a certified copy of Respondent's 2015 tax returns dated as prepared on April 5, 2016. Then, Respondent's R in evidence is a certified copy of Respondent's 2014 federal and New York State and Respondent's P in evidence -provided in discovery read "Amended" on the top portion of the form.
Moreover, Respondent registered her motor vehicles in Virginia, her Health Coverage tax form listed the address of the Virginia house, her USAA letter dated July 9, 2015 was addressed to her at the Virginia house confirming her membership eligibility; her USAA car insurance showed the Virginia address; her Medicare Summary listed the Virginia house for claims processed December 25, 2015 through March 24, 2016 (Petitioner's 17 in evidence); and her collection of Social Security benefits had the Virginia address via direct deposit. Also, during February 1, 2011 through January 31, 2013, she sublet the subject premises and listed her address as a Kentucky address. Once again on November 2015 Respondent sent Petitioner a written request to sublet the subject premises (Petitioner's 24 in evidence). Clearly, Respondent had no intention of primarily residing at the subject premises and attempted at least twice to sublet in order to continue holding onto the subject premises. When considered, all these factors weigh against Respondent's claim that she primarily resided at the subject premises for the relevant time period. Moreover, during her testimony, Respondent referred to the Virginia house as "home" but never used the word "home" when referring to the subject premises. 
As previously discussed, Respondent's failure to raise the itinerant work defense in her Verified Amended Answer amounts to a waiver of that affirmative defense. Lippo v. Cruz, 42 Misc 3d 1230(A), supra. However, assuming this court had considered the itinerant work defense or other reasonable grounds to Respondent's prolonged absences, Respondent's claim that her absences from the premises were due to work was inconsistent with the evidence. For instance, the Renaissance fairs in Florida, Virginia and New York were held over the weekends. As such, Respondent had plenty of time to return to the subject premises. Despite these free time frames, Respondent was unable to provide any excusable reason for her failure to regularly reside at the subject premises. Emel Realty Corp. v. Carey, 188 Misc 2d 280 (A T 1st Dep;t 2001) aff'd, 288 AD2d 163 (1st Dep't 2001); SJS Thompson, LLC v. Singer, 77 Misc 3d 136(A) supra. Instead, Respondent chose to return to the Virginia house at every free opportunity. She only returned to the subject premises in August for convenience and access to the New York fair held there yearly from August to early October.
This court is mindful of the following:
A tenant of a stabilized apartment who maintains a primary residence elsewhere, and also seeks to retain the stabilized apartment for convenience or for considerations of personal gain, is not one who is a victim of the housing crisis but may rather be said to be a contributing and exacerbating factor in the continuation of the critical shortage of affordable apartments. The aims of the Rent Stabilization Law are better served when such occupancy is discouraged by way of allowing a successful landlord to recover, when authorized by the terms of the lease, the legal fees and expenses necessarily incurred in bringing proceedings to establish the tenant's nonprimary use.
Cier Indus. Co. v. Hessen, 136 AD2d 145 (1st Dep't 1988).
Likewise, here, Petitioner is allowed to successfully recover the subject premises, when authorized by the law on the basis of non-primary residence against Respondent. Respondent should not benefit from a rent regulated unit merely for her convenience and personal gain. Such an occupancy by Respondent is discouraged. Cier Indus. Co. v. Hessen, supra. Lastly, this court disapproves of this type of misuse of a rent regulated space. Kevco Grp. LLC v Simmons, 71 Misc 3d 139 (A) (1st Dep't 2021).
Accordingly, after trial, final judgment of possession in favor of Petitioner and against Respondent, Gayle Balcon, forthwith issuance of the warrant of eviction and the execution of the warrant of eviction is stayed to July 31, 2024 for Respondent to vacate with dignity. Upon default in vacatur, the warrant may execute, after service of a notice of eviction to Respondent.
ORDERED: The clerk is to enter a possessory judgment against Respondent, Gayle Balcon, forthwith issuance of the warrant of eviction and execution of the warrant of eviction is stayed to July 31, 2024 with earliest eviction date of August 1, 2024.
And further
ORDERED: Petitioner to forthwith serve a copy of this Decision and Order with Notice of Entry on Respondent.
And further
ORDERED: The parties are directed to pick up their exhibits within thirty days or they will either be sent to the parties or destroyed at the Court's discretion in compliance with DRP-185.
This is the decision and order of the Court, copies of which are being uploaded to NYSCEF.
Dated: New York, NY
February 2, 2024
Frances A. Ortiz, J.H.C.

Footnotes

Footnote 1: As such, the relevant time period for non-primary residence claim is December 23, 2013 to December 23, 2015.

Footnote 2: At some point during the litigation of this matter, the petition was amended to reflect "GSKP, LLC" as petitioner/owner herein.

Footnote 3: Although there is an expectation of some hostility or defensiveness from a witness being crossed examined, Respondent's responses were excessively combative and defensive.

Footnote 4: These tax returns were provided in discovery.

Footnote 5: This date posted dated the commencement of this proceeding.

Footnote 6: RSC §2523.5(b)(2) was recently amended and such language now appears in RSC §2523.5(b)(3).